In the

# United States Court of Appeals
### For the Seventh Circuit

Nos. 09-3872 & 09-3965

CYNTHIA N. YOUNG, on behalf of
herself and others similarly situated,

*Plaintiff-Appellant/*
*Cross-Appellee*,

*v.*

VERIZON'S BELL ATLANTIC CASH
BALANCE PLAN, et al.,

*Defendants-Appellees/*
*Cross-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 C 07314—**Morton Denlow**, *Magistrate Judge.*

ARGUED JUNE 1, 2010—DECIDED AUGUST 10, 2010

Before BAUER, FLAUM, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* "People make mistakes. Even
administrators of ERISA plans." *Conkright v. Frommert*,
130 S. Ct. 1640, 1644 (2010). This introduction was fitting

in *Conkright*, which dealt with a single honest mistake in the interpretation of an ERISA plan. It is perhaps an understatement in this case, which involves a devastating drafting error in the multi-billion-dollar plan administered by Verizon Communications, Inc. ("Verizon").

Verizon's pension plan contains erroneous language that, if enforced literally, would give Verizon pensioners like plaintiff Cynthia Young greater benefits than they expected. Young nonetheless seeks these additional benefits based on ERISA's strict rules for enforcing plan terms as written. Although Young raises some forceful arguments, we conclude that ERISA's rules are not so strict as to deny an employer equitable relief from the type of "scrivener's error" that occurred here. We will accordingly affirm the district court's judgment granting Verizon equitable reformation of its plan to correct the scrivener's error.

## I. Background

### A. Bell Atlantic's Pension Plans

Bell Atlantic, the predecessor of Verizon, operated the Bell Atlantic Management Pension Plan ("BAMPP") until 1996. The BAMPP expressed an employee's retirement benefit as a defined annuity, but employees also had the option of receiving a lump sum if they retired during specified "cashout windows." For certain employees who retired during the 1994-1995 cashout window, the BAMPP provided a lump sum equal to the "actuarial equivalent present value" of the employee's pension

benefit, but calculated using an enhanced discount rate. Specifically, section 4.19 of the BAMPP required the use of a discount rate of "120% of the applicable . . . PBGC [Public Benefit Guarantee Corporation] interest rate in effect" at the time of severance.

In 1996, Bell Atlantic adopted the Bell Atlantic Cash Balance Plan to replace the BAMPP. The new Plan expressed an employee's benefit as a cash balance that grew steadily with the employee's age and years of service. Under the Cash Balance Plan, employees still had the option of receiving their retirement benefit as either an annuity or a lump sum.

Key to this transition to the Cash Balance Plan was converting the value of employees' benefits under the old BAMPP to cash balances under the new Plan. The Plan used "transition factors," a series of multipliers that increased with employees' age and years of service, to make the conversion. The Plan language describing this conversion is critical, so we reproduce it in some detail (the emphasis is ours):

**16.5 Opening Balance**

. . . .

**16.5.1 Pension Conversions as of the Transition Date**

*Where a present value must be determined under this Section 16.4* [sic, should read "Section 16.5"]*, the present value shall be determined as follows: (a) using the PBGC interest rates which were in effect for September of 1995 . . . .*

**16.5.1(a) 1995 Active Participants and 1995 Former Active Participants**

. . . the opening balance of the Participant's Cash Balance Account on January 1, 1996 shall be the amount described in subsection (1) or (2) below, as applicable:

> **16.5.1(a)(1) If Eligible for Service Pension**
>
> . . . .
>
> **16.5.1(a)(2) Not Eligible for Service Pension**
>
> In the case of a Participant who is not eligible for a Service Pension under the 1995 BAMPP Plan as of the Transition Date, the amount described in this paragraph (2) is *the product of multiplying* (A) *the Participant's applicable Transition Factor described in Table 1 of this Section, times* (B) *the lump-sum cashout value of the Accrued Benefit payable at age 65 under the 1995 BAMPP Plan*, determined as if the Participant had a Severance From Service Date on December 31, 1995, based on Compensation paid through December 31, 1995, *multiplied by the applicable transition factor described in Table 1 of this Section*. . . .

**B. Young's Administrative Claim**

Cynthia Young worked for Bell Atlantic from 1965 to 1997. When the Cash Balance Plan took effect in 1996,

Young was not eligible for a service pension under the BAMPP—that is, her age and service level did not qualify her for full retirement benefits—so her opening cash balance was calculated using § 16.5.1(a)(2), for a resulting balance of $240,127. By the time Young retired in 1997, her cash balance had grown to the point that she received a lump-sum benefit of $286,095.

Several years later, in 2004, Young filed a claim with the Claims Review Unit of Verizon (which by then had taken over Plan administration as Bell Atlantic's successor). Young claimed that Bell Atlantic made two errors in calculating her opening cash balance, and hence her ultimate pension benefit, under the Cash Balance Plan. First, Young read the language of § 16.5.1(a)(2) to require that the "applicable transition factor" be multiplied twice to convert her lump-sum cashout under the BAMPP to her opening cash balance under the new Plan. Bell Atlantic, however, multiplied the transition factor only once when making the conversion. Second, Young claimed that Bell Atlantic improperly applied the 120% PBGC discount rate used in the 1995 BAMPP to determine the "lump-sum cashout value" under § 16.5.1(a)(2). Young contended that Bell Atlantic should have used a discount rate of simply 100% of the PBGC rate.

Verizon's Claims Review Unit denied Young's claims, and on appeal, Verizon's Claims Review Committee affirmed. The Committee concluded that the intended meaning of § 16.5.1(a)(2) was to use only a single transition factor to calculate opening cash balances; the

section's second reference to the "applicable transition factor" was a drafting mistake. As for Young's discount rate claim, the Committee concluded that § 16.5.1(a)(2) incorporated the 120% PBGC rate used in the 1995 BAMPP by referring to "the lump-sum cashout value . . . under the 1995 BAMPP Plan."

### C. Young's Federal Court Class Action

In 2005, Young brought a federal court action under ERISA § 502(a), 29 U.S.C. § 1132(a), against Verizon and its Cash Balance Plan (collectively "Verizon"). Young asserted the same claims she raised in Verizon's administrative process, arguing that Verizon improperly applied only a single transition factor and the 120% PBGC discount rate to calculate her opening cash balance. The parties agreed to treat the case as a class action, and the district court certified a class of some 14,000 Bell Atlantic/Verizon pensioners similarly situated to Young.

Young's class action presented the district court, acting through Magistrate Judge Denlow, with a challenge. The court was confronted with a convoluted ERISA plan that seemed to contain a costly drafting error, but an uncertain state of law on the scope of the court's review of such an error. So the court decided to bifurcate the trial into two phases and apply alternative standards of review. In the first phase, the court assumed that it was limited to examining the administrative record and reviewing the Verizon Review Committee's denial of benefits under a deferential standard. (The Cash Balance Plan granted Verizon, as plan administrator, broad dis-

cretion to interpret the Plan, so judicial review was constrained to an "arbitrary and capricious" standard. *Black v. Long Term Disability Ins.*, 582 F.3d 738, 743-44 (7th Cir. 2009).) Under this standard, the district court upheld the Committee's denial of Young's discount rate claim. Conversely, on Young's transition factor claim, the court concluded that the Committee abused its discretion in unilaterally disregarding the second reference to the transition factor in § 16.5.1(a)(2) as a drafting mistake. If Verizon wished to avoid that mistake, it would have to seek a court order for equitable reformation of the Plan.

Taking the district court's cue, Verizon counterclaimed for equitable reformation of the Plan to remove the second transition factor in § 16.5.1(a)(2) as a "scrivener's error." The court took up Verizon's counterclaim in the second phase of the trial, in which the court conducted a de novo review of the Plan and allowed the parties to introduce extrinsic evidence on the intended meaning of § 16.5.1(a)(2). And that evidence overwhelmingly showed that the inclusion of the second transition factor was indeed a scrivener's error.

The drafting history of the 1996 Plan revealed how the second, erroneous transition factor came to be. Six drafts of the Plan were prepared prior to the final version. The first three drafts were prepared by Mercer Human Resources Consulting, an outside firm hired by Bell Atlantic, and contained no mention of a second transition factor. It was not until one of Bell Atlantic's in-house attorneys, Barry Peters, took over drafting responsibility that the second transition factor appeared. In working on the

fourth draft, Peters restructured the conversion formula under § 16.5.1(a)(2) into a more readable "A times B" format, but in doing so, neglected to delete a trailing clause from the previous draft that referred to "the applicable Transition Factor." Testifying in the district court, Peters admitted that he made this mistake in failing to delete the trailing clause in § 16.5.1(a)(2), thereby duplicating the transition factor. Peters's mistake survived unnoticed in the fifth, sixth, and final drafts of the Plan.

In addition to the drafting history, the correspondence between Bell Atlantic and plan participants showed an expectation that only a single transition factor would be used to calculate opening cash balances. In October 1995, Bell Atlantic sent participants a brochure entitled, "Introducing Your Cash Balance Plan," which clearly depicted opening cash balances as the product of an employee's lump-sum value under the 1995 BAMPP and a single transition factor. In November 1995, Bell Atlantic sent participants personalized statements of their estimated opening account balances, which also illustrated the use of a single transition factor. Following the implementation of the Plan, Bell Atlantic sent participants personalized statements of their actual opening balances, and thereafter quarterly cash balance statements, which, again, reflected the use of only one transition factor. Notably, though, these Plan-related communications contained "plan trumps" provisions cautioning that, in the event of discrepancies between those communications and the Plan, the Plan would govern.

Also convincing was the course of dealing between Bell Atlantic/Verizon and plan participants. Bell Atlantic consistently calculated opening cash balances using a single transition factor and paid benefits accordingly. Taking Young's case as an example, her transition factor was 2.659. The estimated opening balance statement that Young received illustrated the multiplication of this 2.659 transition factor by her BAMPP lump-sum cashout value of $90,027, for an estimated opening balance of $90,027 × 2.659 = $239,381. The actual opening balance statement that Young received in 1996 applied the same, single-transition-factor formula to slightly different numbers: $90,307 × 2.659 = $240,127. Prior to Young's lawsuit, no employee complained that opening balances should have been increased by an additional transition factor. For her part, Young admitted that she never relied on the transition factor language in § 16.5.1(a)(2) prior to this litigation.

Based on this evidence of the intended meaning of the Plan, the district court found that the second transition factor in § 16.5.1(a)(2) was a scrivener's error and granted Verizon's counterclaim for equitable reformation. The court also resolved a host of other arguments raised by the parties, many of which we discuss below. But suffice it to say, the district court's treatment of the issues presented by this case was exhaustive. Over the course of a four-year, multi-phase litigation, the court built a complete record, fully explored alternative bases of decision, and sharply honed the issues for appellate review. These commendable efforts by the district court, as well as the fine advocacy by both sides, have

greatly assisted this court in deciding this complex ERISA case.

## II.  Analysis

### A.  Statute of Limitations

Before reaching the merits, we must address each side's argument that the other's claims are barred by the statute of limitations. ERISA does not provide a limitations period for actions brought under § 502, 29 U.S.C. § 1132, so we borrow the most analogous statute of limitations from state law. *Berger v. AXA Network LLC*, 459 F.3d 804, 808 (7th Cir. 2006). We do not automatically borrow the forum state's limitations period; if another state has a significant connection to the dispute and its limitations period is more consistent with federal ERISA policies, that state's limitations period should apply. *Id.* at 813. For actions such as this one to enforce ERISA plans under § 502(a), we have previously borrowed state limitations periods for suits on written contracts. *Leister v. Dovetail, Inc.*, 546 F.3d 875, 880-81 (7th Cir. 2008); *Daill v. Sheet Metal Workers' Local 73 Pension Fund*, 100 F.3d 62, 65 (7th Cir. 1996).

The parties agree that Pennsylvania's four-year statute of limitations for breach of contract actions, 42 Pa. Cons. Stat. § 5525, should apply to this ERISA case. Pennsylvania has the most significant connection to this dispute, since Bell Atlantic was headquartered and drafted the Cash Balance Plan there. Also, more class members currently live in Pennsylvania than any other state, and while a

few class members live in the forum state of Illinois, Young has never lived or worked there. We further note that the Plan contains a choice of law provision stating that Pennsylvania law will fill any gaps left by federal ERISA law. *See Berger*, 459 F.3d at 813-14 (considering choice of law clause as a non-controlling but relevant factor in selecting a limitations period).

The real point of contention is the accrual date of the parties' claims, that is, when Pennsylvania's four-year limitations period started to run. Although federal courts borrow state limitations periods for certain ERISA claims, the accrual of those claims is governed by federal common law. *Daill*, 100 F.3d at 65.

Beginning with Young's ERISA claim, we have held that a claim to recover benefits under § 502(a) accrues "upon a clear and unequivocal repudiation of rights under the pension plan which has been made known to the beneficiary." *Id.* at 66. In this case, Young did not receive a clear repudiation of her claim for additional benefits until 2005, when Verizon's Review Committee resolved her administrative appeal. (Actually, the Committee denied Young's claim with respect to the discount rate issue in 2005 but took until 2007 to deny her claim with respect to the transition factor issue. Since it is obvious that Young's entire federal court action, filed in 2005, would be timely using a 2005 accrual date, this distinction is immaterial.) Prior to denying Young's administrative claim, Verizon did not inform Young that it rejected her interpretation of the Plan calling for two transition factors and a 100% PBGC dis-

count rate. *Cf. id.* at 66 (claim accrued upon correspondence from plan disagreeing with participant's understanding of benefits).

Verizon argues that Young's claim accrued in February 1998, when she received her lump-sum benefit computed under Verizon's interpretation of the Cash Balance Plan. At that time, however, the parties' dispute over the correct interpretation of the Plan had not developed. And nothing suggests that the $286,095 payment that Young received should have been a red flag that she was underpaid. *Cf. Redmon v. Sud-Chemie Inc. Ret. Plan for Union Employees*, 547 F.3d 531, 539 (6th Cir. 2008) (finding a clear repudiation when the plan stopped making payments entirely, but not earlier when the payment amount was merely inconsistent with the plaintiff's understanding of benefits). The 1998 payment that Young received was not so inconsistent with her current claim for additional benefits as to serve as a clear repudiation.

Moving to Verizon's counterclaim, Seventh Circuit precedent provides less guidance on the accrual of a claim for equitable reformation under ERISA § 502(a)—understandably so, since the cognizance of such a claim is an issue of first impression for this court. The general federal common law rule is that an ERISA claim accrues when the plaintiff knows or should know of conduct that interferes with the plaintiff's ERISA rights. *See Berger*, 459 F.3d at 815-16 (accrual when beneficiaries learned of change in employer's method for determining benefit eligibility); *Teumer v. Gen.*

*Motors Corp.*, 34 F.3d 542, 550 (7th Cir. 1994) ("Once an unlawful action is taken, a claim accrues when the putative plaintiff discovers the *injury* that results."). Applying this rule to Verizon's reformation action, we consider when Verizon should have known that the scrivener's error in the Cash Balance Plan, if left unreformed, would impede its rights under the Plan.

The district court found, and Verizon does not dispute, that Verizon's predecessor Bell Atlantic learned of the scrivener's error in 1997. Indeed, Bell Atlantic removed the second, erroneous transition factor from the 1998 plan that it adopted to replace the 1997 version of the Cash Balance Plan. Still, we conclude that this 1997 discovery did not give Verizon notice of the need to reform the scrivener's error, given a course of dealing consistent with Verizon's interpretation of the Plan.

Verizon always treated the Plan's second transition factor as a drafting mistake, and through correspondence with plan participants, it communicated that only a single transition factor would be used to calculate opening cash balances. Verizon consistently paid benefits using this formula, and prior to Young's administrative claim, no employee communicated a contrary understanding that Plan benefits should be calculated using two transition factors. *Cf. Tolle v. Carroll Touch, Inc.*, 977 F.2d 1129, 1141 (7th Cir. 1992) (employee's ERISA unlawful discharge claim accrued when employer communicated discharge decision); *Bowes v. Travelers Ins. Co.*, 173 F. Supp. 2d 342, 346 (E.D. Pa. 2001) (applying Pennsylvania law, claim for reformation of written con-

tract accrued when conflicting oral statements under-
lying the dispute were made). Under these circum-
stances, although Verizon discovered the drafting
mistake in 1997, it did not then know that this mistake
would give rise to a controversy requiring it to raise
an equitable reformation claim. *See Int'l Union v. Murata
Erie N. Am., Inc.*, 980 F.2d 889, 901 (3d Cir. 1992) (ERISA
claim did not accrue when plan sponsor amended
plan absent evidence that participants knew of any poten-
tial controversy over amended language). Instead, it
was not before Young put the transition factor language
at issue in her 2005 federal court action that Verizon's
counterclaim for equitable reformation accrued.

None of the parties' claims accrued before 2005 when
Young brought her federal court ERISA action, so these
claims are timely under the applicable Pennsylvania four-
year limitations period. We may proceed to the merits
of Verizon's claim for equitable reformation and Young's
claim for additional benefits under ERISA § 502(a).

## B.  Equitable Reformation Due to Scrivener's Error

ERISA is a comprehensive statute designed to uniformly
regulate employee benefit plans. *Aetna Health Inc. v. Davila*,
542 U.S. 200, 208 (2004). To achieve uniformity, ERISA
contains numerous requirements for adopting and ad-
ministering plans. Plans must be "established and main-
tained pursuant to a written instrument." 29 U.S.C.
§ 1102(a)(1). The plan terms must be communicated to
participants through an easily understood "summary plan
description," as well as a "summary of any material

modification" to the plan. *Id.* § 1022(a). These ERISA-required writings are given primary effect and strictly enforced, and plan administrators must adhere to "the bright-line requirement to follow plan documents in distributing benefits." *Kennedy v. Plan Adm'r for DuPont Sav. & Inv. Plan*, 129 S. Ct. 865, 876 (2009).

While ERISA's strict requirements "ensure[ ] fair and prompt enforcement of rights under a plan," Congress was careful not to make those requirements so onerous "that administrative costs, or litigation expenses, unduly discourage employers from offering plans in the first place." *Conkright v. Frommert*, 130 S. Ct. 1640, 1649 (2010) (quotations omitted). So ERISA also allows some flexibility in plan administration and enforcement to achieve fair, equitable results. In particular, employers may grant plan administrators broad discretion in inter-preting plan terms. *Id.* "Deference promotes efficiency by encouraging resolution of benefits disputes through internal administrative proceedings rather than costly litigation." *Id.*

Another ERISA provision that promotes equitable plan enforcement—and the statute important here—is § 502(a)(3), which allows a plan participant, beneficiary, or fiduciary to bring a civil action for "appropriate equitable relief." 29 U.S.C. § 1132(a)(3)(B). The Supreme Court has explained that the statute authorizes "those categories of relief that were *typically* available in equity" during the days when common law courts were divided as courts of law or of equity. *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 256 (1993); *see also Kenseth v. Dean*

*Health Plan, Inc.*, No. 08-3219, 2010 WL 2557767, at *24 (7th Cir. June 28, 2010) (describing categories of equitable relief available under 29 U.S.C. § 1132(a)(3)). The issue in this case, then, is whether Verizon's claim for equitable reformation of its Cash Balance Plan is the type of equitable relief authorized by § 502(a)(3).

We have never considered whether § 502(a)(3) authorizes equitable reformation of an ERISA plan due to a scrivener's error, but our case law addressing the related problem of ambiguous plan language suggests that such relief may be appropriate.

In *Mathews v. Sears Pension Plan*, 144 F.3d 461 (7th Cir. 1998), we put the parties' reasonable expectations ahead of the literal text of an ERISA plan. Although the plain language of the plan suggested a benefits formula more favorable to employees, the employer offered objective, extrinsic evidence showing an "extrinsic ambiguity" in this language. *Id.* at 466-67. The summary plan documents and the parties' course of dealing were consistent with the employer's reading of the plan, so we declined to adopt the employees' contrary reading under "rigid and archaic" rules of contract interpretation. *Id.* at 469.

We reached a different result in *Grun v. Pneumo Abex Corp.*, 163 F.3d 411, 420-21 (7th Cir. 1998), refusing to set aside unambiguous plan language based on an employer's claim of "mutual mistake." Still, we acknowledged that such relief would be available in "the rare case where literal application of a text would lead to absurd results or thwart the obvious intentions of its

drafters." *Id.* at 420 (quotation omitted). Reformation was inappropriate in *Grun* because the employee relied on the literal plan language to predict his right to severance compensation. *Id.* at 421; *cf. Mathews*, 144 F.3d at 469 (noting absence of claim that any beneficiary actually relied on plan language).

Other circuits have directly addressed claims for equitable reformation of an ERISA plan. Using reasoning similar to that in *Mathews* and *Grun*, these courts have either concluded that ERISA authorizes such relief or does not foreclose the possibility.

Verizon's strongest case is *Int'l Union v. Murata Erie N. Am., Inc.*, 980 F.2d 889, 907 (3d Cir. 1992), in which the Third Circuit recognized an employer's § 502(a)(3) claim to correct a "scrivener's error" in a plan provision on the distribution of excess funds. The court found equitable reformation appropriate because holding the employer to the scrivener's error would produce "what is admittedly a 'windfall'"—"an excess remaining in the Plans" that the plaintiffs could not have reasonably expected. *Id.* The Eighth Circuit applied a similar rationale in *Wilson v. Moog Auto., Inc. Pension Plan*, 193 F.3d 1004, 1008-10 (8th Cir. 1999), to conclude that an ERISA plan's failure to provide a minimum age for retirement benefits was a reformable mistake. Reformation was possible because extrinsic evidence showed that none of the plaintiffs actually relied on the erroneous plan language or believed that they would be eligible for early retirement. *Id.* at 1009-10.

The Ninth Circuit distinguished *Murata* in *Cinelli v. Sec. Pac. Corp.*, 61 F.3d 1437, 1444-45 (9th Cir. 1995), rejecting

an employee's claim that the absence of a plan provision entitling him to vested life insurance benefits was a mistake. Although reformation of a scrivener's error was appropriate in *Murata* to avoid a "windfall" and uphold employees' reasonable expectations of benefits, those factors were lacking in *Cinelli*. *Id.* at 1445. Likewise, in *Blackshear v. Reliance Standard Life Ins. Co.*, 509 F.3d 634, 643-44 (4th Cir. 2007), *abrogated on other grounds as stated in Williams v. Metro. Life Ins. Co.*, Nos. 09-1025 & 09-1568, 2010 WL 2599676, at *5 (4th Cir. June 30, 2010), the Fourth Circuit declined to equitably reform an ERISA plan under the circumstances, where the plan language was clear and neither the summary plan description nor other plan documents supported the employer's claim of a scrivener's error.

From this authority, we conclude that ERISA § 502(a)(3) authorizes equitable reformation of a plan that is shown, by clear and convincing evidence, to contain a scrivener's error that does not reflect participants' reasonable expectations of benefits. Though complex in design, ERISA maintains the basic goal of "protecting employees' justified expectations of receiving the benefits their employers promise them." *Cent. Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 743 (2004). It would thwart this goal to enforce erroneous plan terms contrary to those expectations, even if doing so would increase employees' benefits. The "appropriate equitable relief" authorized by § 502(a)(3) allows a court to reform an ERISA plan to avoid such an unfair result. *See Cent. Pa. Teamsters Pension Fund v. McCormick Dray Line, Inc.*, 85 F.3d 1098, 1105 n.2 (3d Cir. 1996) ("[I]n circumstances where a court can

establish that no plan participants were likely to have relied upon the scrivener's error in question . . . allowing reformation of the scrivener's error does not thwart ERISA's statutory purpose . . . ."); *Murata*, 980 F.2d at 907 ("[T]he alleged error relates to what is admittedly a 'windfall' . . . that neither side could have reasonably expected."); *cf. Mathews*, 144 F.3d at 469 ("We cannot see how ERISA beneficiaries or anyone else . . . would be benefited by the adoption of principles of contractual interpretation so rigid and archaic as to permit the class to reap the pure windfall here sought to the potential prejudice of other beneficiaries.").

We acknowledge, like the Third Circuit in *Murata*, 980 F.2d at 907, that equitable reformation of an ERISA plan creates some tension with the "written instrument" requirement of 29 U.S.C. § 1102(a)(1), also known as the "plan documents rule," *Kennedy*, 129 S. Ct. at 877. This rule ensures "that every employee may, on examining the plan documents, determine exactly what his rights and obligations are under the plan," *Murata*, 980 F.2d at 907, without complicated "enquiries into nice expressions of intent" behind plan language, *Kennedy*, 129 S. Ct. at 875. Young cautions that allowing equitable reformation of ERISA plans will undermine the efficient, easily enforceable plan documents rule and encourage protracted, discovery-intensive litigation over the intended meaning of a plan.

Even so, since we interpret § 502(a)(3) to authorize the equitable reformation claim asserted here, we cannot simply reject such a claim based on the added litigation

burden that it might represent. Moreover, we see little difference between the intent-based inquiry that took place in this reformation case and what must occur in the related case of an ambiguous ERISA plan. In each case, the court must look beyond the plan document to extrinsic evidence to determine the parties' understanding of the plan. *See Mathews*, 144 F.3d at 467. We do not think that the availability or scope of this judicial inquiry should turn on whether the error in an ERISA plan is deemed an "ambiguity" or a "scrivener's error." Drafting mistakes in ERISA plans may take many forms; some involve language that is ambiguous on its face while others, like the mistake here, involve language that is not intrinsically ambiguous but still misstates participants' benefits. It would not further the purposes of ERISA to allow courts to correct one type of mistake but not the other.

Also, other limitations on the equitable reformation claim that we recognize under § 502(a)(3) will mitigate its impact on the plan documents rule. Only those who can marshal "clear and convincing" evidence that plan language is contrary to the parties' expectations will have a viable claim. *Murata*, 980 F.2d at 908. This standard of proof is rigorous, requiring evidence that is "clear, precise, convincing and of the most satisfactory character that a mistake has occurred and that the mistake does not reflect the intent of the parties." *Id.* at 907 (quotation omitted); *accord Blackshear*, 509 F.3d at 642. The evidence also must be "objective" and not dependent "on the credibility of testimony (oral or written) of an interested party." *Mathews*, 144 F.3d at 467. These high

standards of proof should deter an employer from seeking to reform plan language simply because it has proven unfavorable.

In this case, though, we agree with the district court that Verizon presented enough objective, convincing evidence to show that the second reference to the transition factor in § 16.5.1(a)(2) of the Cash Balance Plan was a scrivener's error inconsistent with participants' expected benefits.

The drafting history left little doubt that the second transition factor in § 16.5.1(a)(2) was a mistake. It first appeared in the fourth draft of the Plan, the first draft prepared by Bell Atlantic attorney Barry Peters. This draft reformatted the multiplication formula in § 16.5.1(a)(2), but in doing so, failed to omit the prior draft's trailing clause that referred to the transition factor, thereby duplicating the transition factor. We need not rely on Peters's arguably self-serving testimony to conclude that this botched reformatting led to the second transition factor; so much is clear by comparing the fourth draft with the prior version. And given the absence of any evidence contemporaneous to the fourth draft suggesting that Bell Atlantic was reworking the Plan to increase benefits, it is evident that duplicating the transition factor was a drafting mistake.

The communications and course of dealing between Bell Atlantic/Verizon and plan participants further illustrate that the parties intended a single-transition-factor formula. Young and other participants received a Plan brochure that described their opening cash balances

as the product of their lump-sum values under the 1995 BAMPP and a single transition factor. Although the brochure did not explicitly state that a "single" transition factor would be used, the formula depicted in the brochure makes clear that only one multiplier would apply. That was confirmed in the personalized statements sent to participants of their estimated and actual opening cash balances, which reported values based on the use of a single transition factor. By way of illustration, Young received an estimated opening balance statement that reported her transition factor of 2.659 and her BAMPP lump-sum cashout value of $90,027, for an estimated opening balance of $239,381. Her actual opening balance reported in a later statement, $240,127, was calculated similarly. If a second 2.659 transition factor were applied to these figures, Young's estimated and actual opening balances would have been $636,514 and $638,498, respectively. Bell Atlantic/Verizon never squared transition factors in this manner but instead calculated benefits using only a single transition factor, consistent with the Plan communications. Prior to Young's claim, no employee complained that cash balances should have been increased by an additional transition factor.

Granted, many of the Plan communications, including the Plan brochure and opening balance statements, are less compelling because they contain what Young describes as "plan trumps" provisions, which stated that the communications were subordinate to any contrary language in the Plan. As Young points out, were the situation reversed and the employee-favorable language

contained in a Plan communication rather than the Plan itself, Verizon no doubt would contend that these plan trumps provisions barred Young from relying on the communication. *See Kolentus v. Avco Corp.*, 798 F.2d 949, 958 (7th Cir. 1986) ("[W]hen the summary booklet expressly states that it is merely an outline of the pension plan and that the formal text of the plan governs in the event a question arises, the plaintiffs cannot rely on the general statements of the booklet but must look to the plan itself."). Young's point is well-taken, but we cannot agree that the mere existence of plan trumps provisions precludes Verizon from reforming the Plan consistent with Plan communications. At issue is whether Verizon has established by clear and convincing evidence that the intended meaning of § 16.5.1(a)(2) was to apply only a single transition factor to calculate opening cash balances. Verizon may include all the Plan communications describing a single-transition-factor formula as part of that evidence, even though they contain plan trumps provisions.

Based on this evidence of the intended meaning of the Plan, the district court correctly found that the second transition factor in § 16.5.1(a)(2) was a scrivener's error inconsistent with plan participants' expected benefits. Under these circumstances, equitable reformation of the Plan to remove the error is appropriate.

We close our discussion of Verizon's reformation claim by considering additional defenses to equitable relief. Because Verizon's claim is one for "appropriate equitable relief" under ERISA § 502(a)(3)(B), 29 U.S.C.

§ 1132(a)(3)(B), it is subject to the traditional equitable defenses at common law, provided that they are not inconsistent with ERISA.

Young raises the defense of "good faith" and "fair dealing," under which a contracting party may be precluded from reforming a mistake caused by the party's own "gross" negligence. Restatement (Second) of Contracts § 157 & cmt. a (1981). As the district court put it, Bell Atlantic/Verizon's failure to prevent the drafting mistake in § 16.5.1(a)(2) was "profound" negligence. Bell Atlantic charged a single in-house attorney, Barry Peters, with revising a critical provision of a multi-billion-dollar pension plan, apparently without critical review by another ERISA expert. It is baffling that a major corporation would not invest greater resources to ensure accuracy in the drafting of such an important document. Still, we cannot agree with Young that this institutional failure showed a lack of good faith. Verizon never misrepresented its intended meaning of the Cash Balance Plan, and indeed, based on the extrinsic evidence examined above, it made great efforts to accurately communicate how participants' benefits would be calculated. *Cf. id.* cmt. a, illustration 2 (misrepresentation that party verified bid for accuracy was failure to act in good faith).

For similar reasons, we do not accept Young's "unclean hands" defense, under which "equitable relief will be refused if it would give the plaintiff a wrongful gain." *Scheiber v. Dolby Labs., Inc.*, 293 F.3d 1014, 1021 (7th Cir. 2002). A plaintiff who acts unfairly, deceitfully, or in bad

faith may not through equity seek to gain from that transgression. *See Packers Trading Co. v. Commodity Futures Trading Comm'n*, 972 F.2d 144, 148-49 (7th Cir. 1992). Verizon made a mistake, and a big one at that, in drafting the Cash Balance Plan, but Verizon did not attempt to deceive plan participants regarding their benefit rights under the intended meaning of § 16.5.1(a)(2). *Cf. id.* (barring relief for a plaintiff who concealed his knowledge of the defendant's mistake and then attempted to recover based on that mistake). On the contrary, Verizon's Plan administration and communications reflected its consistent view that opening cash balances would be calculated using only a single transition factor.

Finally, Young raises the equitable defense of laches, or unreasonable delay, by Verizon in seeking equitable reformation. Laches means "culpable delay in suing" and may apply if the plaintiff commits an unreasonable, prejudicial delay in bringing the suit. *Teamsters & Employers Welfare Trust of Ill. v. Gorman Bros. Ready Mix*, 283 F.3d 877, 880 (7th Cir. 2002). For reasons explained above in our discussion of the statute of limitations, Verizon did not unreasonably delay in bringing its equitable reformation claim. Although Verizon learned of the scrivener's error in the Cash Balance Plan in 1997, at that time it had no reason to believe that this error would lead to a benefits dispute. Instead, the parties' correspondence and course of dealing were consistent with Verizon's understanding that only a single transition factor would be used to calculate benefits. By 1998, Verizon had corrected the Plan to reflect this understanding, and

no employee communicated a contrary interpretation before Young brought her administrative claim in 2004. Since this course of conduct reinforced Verizon's interpretation of the Cash Balance Plan, Verizon did not "sleep on [its] rights," *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 820 (7th Cir. 1999), by not bringing an equitable reformation claim before Young's lawsuit.

In sum, no equitable defenses bar Verizon's equitable reformation claim under ERISA § 502(a)(3), and the district court properly granted that claim to remove the scrivener's error from the Cash Balance Plan.

### C. Discount Rate for Opening Cash Balances

In addition to her argument regarding the second transition factor in § 16.5.1(a)(2), Young claimed that Verizon improperly applied the enhanced, 120% PBGC discount rate used in the 1995 BAMPP to calculate her opening balance under the Cash Balance Plan. Verizon's Review Committee denied Young's discount rate claim, and because the Plan grants the administrator broad discretion to interpret Plan provisions, we review the Committee's decision for an abuse of discretion. *See Black v. Long Term Disability Ins.*, 582 F.3d 738, 744 (7th Cir. 2009).

The interpretation of ERISA plans is governed by federal common law, which draws on general principles of contract interpretation to the extent they are consistent with ERISA. *Mathews*, 144 F.3d at 465. Under these principles, contract language is given its plain and ordi-

nary meaning. *Pitcher v. Principal Mut. Life Ins. Co.*, 93 F.3d 407, 411 (7th Cir. 1996). Contracts must be read as a whole, and the meaning of separate provisions should be considered in light of one another and the context of the entire agreement. *Taracorp, Inc. v. NL Indus., Inc.*, 73 F.3d 738, 745 (7th Cir. 1996). Contract interpretations should, to the extent possible, give effect to all language without rendering any term superfluous, *id.* at 746, but if both a general and a specific provision apply to the subject at hand, the specific provision controls, *Medcom Holding Co. v. Baxter Travenol Labs., Inc.*, 984 F.2d 223, 227 (7th Cir. 1993).

The use of a discount rate to calculate opening balances under the Cash Balance Plan occurs by operation of § 16.5.1(a)(2). That section defines opening cash balances as the product of two variables (assuming, of course, one ignores the second "transition factor" that we have disregarded as a scrivener's error): "(A) the Participant's applicable Transition Factor described in Table 1 of this Section, *times* (B) the lump-sum cashout value of the Accrued Benefit payable at age 65 under the 1995 BAMPP Plan . . . ." Under § 4.19 of the BAMPP, which was attached to the Cash Balance Plan as an appendix, lump-sum payments for employees who retired during the 1994-1995 cashout window were calculated using a discount rate of 120% of "the applicable PBGC interest rate."

Reading the language of § 16.5.1(a)(2) in the context of the entire Cash Balance Plan—including the attached 1995 BAMPP—the best interpretation is one that applies the

120% PBGC discount rate used in the 1995 BAMPP to calculate opening cash balances. The plain meaning of the "(B)" variable in § 16.5.1(a)(2)—"the lump-sum cashout value . . . payable . . . under the 1995 BAMPP Plan"—is the lump-sum value *as calculated* under the 1995 BAMPP. Since the BAMPP used a 120% PBGC discount rate, that same methodology carries over to calculating opening balances under the Cash Balance Plan.

Young points to the umbrella section 16.5.1, which provides that any "present value" that "must be determined under this Section 16.[5] shall be determined . . . using the PBGC interest rates which were in effect for September of 1995." Young would apply this present value definition, which uses a discount rate of simply 100% of the PBGC rate, to determine the "lump-sum cashout value" in § 16.5.1(a)(2). Young's interpretation ignores the explicit reference in § 16.5.1(a)(2) to the cashout value "under the 1995 BAMPP Plan." Because § 16.5.1(a)(2) specifically uses the 1995 BAMPP formula for discounting lump-sum values, the more general present value formula in § 16.5.1 does not apply to that section.

We also disagree with Young that incorporating the 1995 BAMPP, 120% PBGC formula into § 16.5.1(a)(2) in this manner renders the 100% PBGC formula in § 16.5.1 superfluous. The latter formula applies broadly to calculate present values under "this Section 16.[5]." Notably, unlike § 16.5.1(a), provisions in § 16.5.2(a) use the "present value" term defined in § 16.5.1 to determine opening cash balances for employees covered by those sections.

So it harmonizes all the language in § 16.5 to give effect to the 120% PBGC rate incorporated into § 16.5.1(a)(2) for that specific provision, while giving effect to the general 100% PBGC rate for other provisions in § 16.5.

The most reasonable reading of § 16.5.1(a)(2) is one that applies the 120% PBGC discount rate to calculate opening cash balances. At the very least, Verizon's Review Committee did not abuse its discretion in adopting this interpretation.

### III. Conclusion

ERISA's rules for written plans are strictly enforced, but they are not so strict as to prevent equitable reformation of a plan that is shown, by clear and convincing evidence, to contain a scrivener's error that is inconsistent with participants' expected benefits.

AFFIRMED.